**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

**KATHRYN A. POLLARI**
        **Plaintiff,**

    v.                                                                                     Case No. 18-C-178

**NANCY A. BERRYHILL,**
**Acting Commissioner of the Social Security Administration**
        **Defendant.**

## DECISION AND ORDER

In 2006, the Social Security Administration found plaintiff Kathryn Pollari disabled due to a seizure disorder. In 2011, the agency terminated her disability benefits due to medical improvement. Plaintiff appealed the termination, but in 2014 an Administrative Law Judge ("ALJ") issued a decision finding her not disabled as of August 19, 2011. The Appeals Council remanded the matter in 2015, but after a second hearing in 2016 the ALJ again found plaintiff not disabled. (Tr. at 16-41.) This time, the Council denied review. (Tr. at 1.) Plaintiff now seeks judicial review of the termination of her benefits. For the reasons that follow, I remand for further proceedings.

## I. STANDARD OF REVIEW

The court reviews an ALJ's decision to ensure that it applies the correct legal standards and is supported by substantial evidence. Stephens v. Berryhill, 888 F.3d 323, 327 (7th Cir. 2018). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. Substantial evidence review is deferential; the court will not re-weigh the evidence or substitute its judgment for that of the ALJ. Summers v.

Berryhill, 864 F.3d 523, 526 (7th Cir. 2017). The court also reads the ALJ's decision as a whole and with common sense, rather than nitpicking at it. Rice v. Barnhart, 384 F.3d 363, 369 (7th Cir. 2004). Nevertheless, the ALJ is required to build an accurate and logical bridge from the evidence to his conclusion. Spicher v. Berryhill, 898 F.3d 754, 757 (7th Cir. 2018). A decision that lacks evidentiary support or an adequate discussion of the issues will be remanded. Kastner v. Astrue, 697 F.3d 642, 646 (7th Cir. 2012); Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009).

## II. DISCUSSION

### A. Sit/Stand Option and Time Off Task

The ALJ determined that plaintiff could perform a range of light work except she "must be allowed to sit or stand alternatively at will provided she is not off task more than 10% of the work period." (Tr. at 27.) The ALJ then accepted the testimony of a vocational expert ("VE") that a person with this residual functional capacity ("RFC") could perform a number of jobs. (Tr. at 40, 110.)[1]

Under SSR 00-4p, the ALJ has an affirmative responsibility to determine whether a VE's testimony conflicts with information provided in the Dictionary of Occupational Titles ("DOT") before relying on that evidence to support a determination of non-disability. Overman v. Astrue, 546 F.3d 456, 462-63 (7th Cir. 2008). If evidence from a VE appears to conflict with the DOT, the ALJ must obtain a reasonable explanation for the conflict. Id. at 463.

In the present case, the ALJ determined that the VE's testimony was consistent with the

---

[1] The ALJ declined to ask questions of the VE at the 2016 hearing, instead relying on the testimony of the VE from the 2014 hearing. (Tr. at 40, 74.)

2

DOT.[2] He then noted that "the availability of a sit/stand option is not discussed in the DOT, and therefore the availability of the sit/stand option with the above representative jobs is based on the professional experience of the vocational expert. The undersigned accepts that testimony." (Tr. at 40.)

As plaintiff notes, the VE did not testify that she was basing this aspect of her opinion on her experience. However, any error was harmless because there is no apparent conflict between the VE's testimony and the DOT, which does not address the subject of sit/stand options. See Collins v. Berryhill, 743 Fed. Appx. 21, 26 (7th Cir. 2018); Zblewski v. Astrue, 302 Fed. Appx. 488, 494 (7th Cir. 2008). Further, because the VE's testimony regarding sit/stand options merely supplemented (and did not conflict with) the DOT, and plaintiff failed to question the VE about the issue at the administrative hearing, the argument is forfeited. See Brown v. Colvin, 845 F.3d 247, 254 (7th Cir. 2016); see also Barrett v. Barnhart, 355 F.3d 1065, 1067 (7th Cir. 2004); Donahue v. Barnhart, 279 F.3d 441, 446-47 (7th Cir. 2002).[3]

---

[2] At the hearing, the ALJ asked the VE if her testimony was consistent with the DOT, and she said "yes." (Tr. at 112.)

[3] Plaintiff argues in reply that Zblewski is distinguishable because in the present case the ALJ determined there was an actual conflict, but then relied on absent testimony to resolve it. The ALJ never said there was a conflict. He noted (correctly) that sit/stand options are not discussed in the DOT. Based on the passage quoted in the text, it is unclear whether the ALJ (mistakenly) believed the VE affirmatively said she was basing her testimony regarding issues not addressed in the DOT on professional experience, or whether he was inferring that she must have done so (and then accepted her testimony that a person could perform certain jobs with the sit/stand option the ALJ described). Regardless, even if the former, the ALJ did not create a conflict where none existed. Plaintiff's attempt to distinguish the forfeiture cases also fails, as she had the opportunity to question the VE about the sit/stand option, which the ALJ included in his hypothetical questions, at the 2014 hearing. See Donahue, 279 F.3d at 446 ("When no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion, even if that conclusion differs from the Dictionary's[.]").

3

While plaintiff's DOT-conflict argument fails to support reversal, her contention that the ALJ did not adequately explain this portion of the RFC gains traction. First, the ALJ's formulation does not appear to be a statement of the most plaintiff can do, see Simila v. Astrue, 573 F.3d 503, 513 (7th Cir. 2009) (noting that RFC is the most a person she can still do despite her limitations), but rather a cap on off-task time related to the sit/stand option consistent with what employers typically tolerate. See, e.g., Bolssen v. Berryhill, No. 15-cv-824-wmc, 2017 U.S. Dist. LEXIS 157832, at *16 (W.D. Wis. Sept. 21, 2017) (stating that 10% "is the maximum percent off-task one can be and still be employable"). The ALJ made no finding that plaintiff actually had the ability to stay on task 90% of the time.

Second, to the extent the ALJ impliedly made such a finding, he failed to explain the basis for his conclusion that plaintiff's need to alternate positions (and/or her other limitations) could be accommodated within the 10% time-off task allowance. See Lanigan v. Berryhill, 865 F.3d 558, 563 (7th Cir. 2017) (remanding where ALJ failed to establish a logical connection between the evidence and a 10% time off-task limitation). The Commissioner argues that Lannigan is distinguishable, as the off-task limitation in that case related to a mental impairment, while here it relates to a sit/stand option designed to accommodate plaintiff's obesity. Limitations must be explained, regardless of whether they stem from physical or mental impairments.[4] To the extent the issue of whether a person can stay on task with an at-will sit/stand option raises a vocational question rather than a medical one, the ALJ's questions

---

[4]The ALJ need not rely on a particular medical opinion in setting RFC, see Schmidt v. Astrue, 496 F.3d 833, 845 (7th Cir. 2007), but he must cite some record evidence supporting, and minimally explain, his conclusions.

4

to the VE did not resolve the issue, leaving a gap in the record.[5]

The Commissioner notes that "the ALJ appeared to impose the 10% off-task limitation merely to communicate to the vocational expert that, in his view, Plaintiff could work with a sit-stand option yet remain on task 90% or more of the time." (Def.'s Br. at 9.) As discussed above, it is unclear why the ALJ phrased the RFC in the manner he did. Assuming the Commissioner is correct, however, it is also unclear why the ALJ inserted his belief regarding the effect of the sit/stand option on productivity, rather than letting the VE assess its impact. The Commissioner further argues that the VE implicitly agreed that the sit/stand option was not work-preclusive, but that too is unclear. Finally, the Commissioner suggests that the ALJ was crediting plaintiff's allegations and accommodating her obesity with this restriction. However, the ALJ did not say that, and my review is limited to the reasons he provided. See, e.g., Jelinek v. Astrue, 662 F.3d 805, 811 (7th Cir. 2011). The matter must be remanded for reconsideration of the sit/stand option and time off-task.

## B.    Listing 11.02(B)

The ALJ determined that since August 19, 2011, none of plaintiff's impairments, including her seizure disorder, met or medically equaled a Listing. (Tr. at 23.) In order to satisfy the current version of Listing 11.02(B), the claimant must have epilepsy, documented by a detailed description of a typical seizure, and characterized by dyscognitive seizures

---

[5]In his first hypothetical question to the VE, the ALJ limited plaintiff to light work involving "simple, routine, repetitive [tasks] in a job where she can be off task five to ten percent of the work day, including, in addition to regularly scheduled breaks." (Tr. at 108.) He later added to the light hypothetical a sit/stand option (without specifically mentioning time off task), and the VE identified the jobs upon which the ALJ ultimately relied. (Tr. at 109-10.) The ALJ then asked a hypothetical involving sedentary work, including a sit/stand option "at will, provided they're not off task more than ten percent of the work period." (Tr. at 110.) This is the same qualifying language the ALJ later included in the RFC. (Tr. at 27.)

5

occurring at least once a week for at least three consecutive months despite adherence to prescribed treatment. 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 11.02 (effective Sept. 29, 2016).[6]

The ALJ found that plaintiff's reported seizures appeared to fall in the category of dyscognitive seizures, that the record did not support of her subjective report of seizure frequency,[7] and that the record indicated she had not been fully compliant with treatment recommendations. (Tr. at 23-24.) In support of the frequency finding, the ALJ noted that while a February 2014 EEG showed abnormal activity, there was no clinical correlation of seizures during that test. The ALJ also noted that, while plaintiff told her doctors in August 2014 that her seizures were getting worse, she presented to the emergency room several times in December 2014 and January 2015 for seizure activity and multiple head CT scans were negative for any signs of trauma. Although a January 2015 EEG was positive for signs of generalized epilepsy, there was no clinical correlation that any of these visits were actually prompted by seizure activity. (Tr. at 23.) On December 14, 2014, plaintiff felt a large seizure was imminent but did not actually have one. (Tr. at 23-24.) Finally, by February 26, 2015, plaintiff reported her seizure disorder as "stable." (Tr. at 24.)

---

[6]The ALJ stated that under sub.(B) the claimant must have dyscognitive seizures "occurring at least once per week for at least three consecutive weeks." (Tr. at 23.) The Commissioner states this criterion as "seizures occurring at least once per month for at least three consecutive months." (Def.'s Br. at 10.) However, the current version of the Listing refers to seizures "occurring at least once a week for at least 3 consecutive months." https://www.ssa.gov/OP_Home/cfr20/404/404-app-p01.htm. Plaintiff agrees that this is the criterion. (Pl.'s Br. at 21.)

[7]At the 2014 hearing, plaintiff testified that she experienced three or four complex partial (dyscognitive) seizures per week. (Tr. at 92.) At the 2016 hearing, she testified that she did recall active seizures during the day but was told she had them when she was sleeping. (Tr. at 67-68.) In a December 2013 report, plaintiff's treating neurologist, Dr. Goldman, indicated that plaintiff had three seizures per week. (Tr. at 85, 1510.)

As plaintiff notes, the ALJ appeared to be looking for objective evidence documenting seizures in real time and in a clinical setting. However, "there is no requirement that medical sources must witness seizure activity for listing frequency to be established." Howard v. Colvin, No. 3:13-CV-95, 2017 U.S. Dist. LEXIS 8766, at *22 (N.D. Ind. Jan. 23, 2017) (citing Boiles v. Barnhart, 395 F.3d 421, 425-26 (7th Cir. 2005)).

Further, the ALJ failed to acknowledge that the January 2015 EEG produced findings "highly eleptogenic in nature" (Tr. at 1776) and that plaintiff was at that time admitted to the hospital for further evaluation (Tr. at 1824) after reporting to the ER in an "extremely confused" state (Tr. at 1822). See Scrogham v. Colvin, 765 F.3d 685, 699 (7th Cir. 2014) (noting that ALJ may not select only facts from the record that support his conclusion, while disregarding facts that undermine it). The February 26, 2015 note indicates: "Overall her seizure frequency remains stable and she is requesting to proceed with replacement surgery for the vagal nerve stimulator. She states that when the device was in she felt her seizures were much better controlled than they are now." (Tr. at 2268.) Thus, considered in context, plaintiff's report of a "stable" condition appears to have been a complaint, as she sought more aggressive treatment to bring her condition under better control. See Murphy v. Colvin, 759 F.3d 811, 819 (7th Cir. 2014) ("Murphy could have been in terrible condition immediately after her stroke and still be characterized as 'stable' by her doctor if her condition had not changed over a period of time."); Bates v. Colvin, 736 F.3d 1093, 1099 (7th Cir. 2013) ("[T]hese statements were cherry-picked from the record, selected without consideration of the context in which they appear."). The ALJ discounted the emergency room visits based on the CT scans, but it is unclear why the absence of head trauma meant plaintiff did not have a seizure. Cf. Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996) ("Since swelling of the joints is not a symptom of

7

fibromyalgia, its absence is no more indicative that the patient's fibromyalgia is not disabling than the absence of headache is an indication that a patient's prostate cancer is not advanced."). Nor did the ALJ explain why the December 14, 2014, false alarm about a large seizure meant plaintiff was not experiencing regular, smaller seizures.

The Commissioner does not defend the ALJ's frequency finding, indicating that even if plaintiff established the requisite number of seizures the ALJ reasonably concluded that she failed to comply with prescribed treatment. In support of the non-compliance finding, the ALJ cited two pieces of evidence (Tr. at 24): a November 8, 2011 hospital note in which plaintiff admitted not taking her medication as prescribed (Tr. at 873) and a July 2016 consultative examination during which plaintiff admitted that she continued to drink despite being aware her consumption of alcohol may be linked to seizure onset (Tr. at 2416).[8]

Plaintiff concedes references to non-compliance in the record but notes significant periods of neurological treatment in 2014-15 where her compliance was not called into question yet she still reported several seizures per week. (E.g., Tr. at 1554.) She further notes the December 2013 report of her treating neurologist, Dr. Goldman, indicating that she complied with medication (Tr. at 1511) yet still experienced three seizures per week (Tr. at 1510).

The Commissioner responds that the treatment notes upon which plaintiff relies state: "Medication compliance: has not been able to increase as recommended by her previous doctor." (Tr. at 1555.) Plaintiff replies that references to compliance issues with her "previous doctor" provide no basis to infer non-compliance with her current provider.[9]

---

[8] At the 2014 and 2016 hearings, plaintiff denied drinking. (Tr. at 66, 96.)

[9] Plaintiff also alleges a Chenery violation in the Commissioner's discussion of these records, but a claimant cannot accuse the ALJ of skipping evidence, then raise Chenery as a

8

Although an ALJ need not discuss every piece of evidence in the record, he may not ignore lines of evidence contrary to his ruling. Terry v. Astrue, 580 F.3d 471, 477 (7th Cir. 2009). Here, the ALJ relied on just two pieces of evidence, one from the beginning and one from the end of the relevant period, overlooking significant evidence in between touching on the compliance issue. The Commissioner disputes that evidence, but I cannot say "with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, [such that] remanding is a waste of time." Spiva v. Astrue, 628 F.3d 346, 353 (7th Cir. 2010).

The Commissioner further argues that any error is harmless, as agency reviewing physician Dr. Walcott opined that plaintiff no longer met Listing 11.02 (Tr. at 1078), and the record contains no contrary medical opinion. However, the ALJ did not credit Dr. Walcott's opinion on this issue, see Parker v. Astrue, 597 F.3d 920, 922 (7th Cir. 2010) (holding that Chenery forbid reliance on non-examining physician reports the ALJ did not mention), and, in any event, Dr. Walcott produced his report in September 2012, well before the continuous period of compliance beginning in January 2014 upon which plaintiff relies and before the Listing was revised in 2016. The matter will be remanded for reconsideration of Listing 11.02(B).

## C. Functional Capacity Evaluation

In support of his finding that plaintiff could perform a range of light work, the ALJ cited

---

bar to any consideration by the Commissioner and the court as to the significance of that evidence. Anderson v. Colvin, No. 13-C-0788, 2014 U.S. Dist. LEXIS 151646, at *88 (E.D. Wis. Oct. 25, 2014).

9

a functional capacity evaluation ("FCE") commissioned by plaintiff's surgeon, Dr. Zikel, completed in April 2015, several months after plaintiff underwent back surgery.[10] During the evaluation plaintiff discontinued tasks due to subjective pain complaints, although the therapist conducting the FCE noted no pain behaviors associated with such high levels of pain. The therapist also noted that while overall endurance and subjective pain are issues of concern, plaintiff lived alone in a multi-story condo, is modified independent with self cares, and performs all household tasks. (Tr. at 29.) The therapist ultimately opined that plaintiff could perform the exertional requirements of light work (Tr. at 29, 1728), and Dr. Zikel indicated on May 5, 2015, that he agreed with the FCE's results and restrictions (Tr. at 30, 1717).

The ALJ stated that he gave the opinions of the therapist and Dr. Zikel based on the FCE significant weight. The therapist generally found plaintiff able to perform light work: lifting 20 pounds occasionally, 10 pounds frequently and the ability to sit occasionally, walk occasionally, and stand occasionally (thus standing and walking together add up to two-thirds of the day). The ALJ acknowledged that the test results sometimes fell short of light exertional work; however, plaintiff's self-limiting behavior, the suggestion of exaggeration at the testing, and the fact that the testing occurred less than six months after plaintiff's back surgery suggested that plaintiff either was or soon became somewhat more functional than the test results record. (Tr. at 32.)

Plaintiff notes that the full range of light work requires standing or walking for up to two-thirds of the day (about six of eight hours), while the FCE found she could stand or walk occasionally (Tr. at 1727), which means about two hours per day. Plaintiff contends that no

---

[10]The record reflects four spinal surgeries, three to the lumbar area and one to the cervical area, the most recent occurring in November 2014. (Tr. at 57.)

10

portion of the FCE report indicates that she can stand or walk within the requirements of light work, yet the ALJ interpreted the FCE as reflecting light work without qualification.

As indicated above, the ALJ acknowledged that the FCE results fell somewhat short of the full range of light work. Moreover, plaintiff offers no response to the ALJ's finding that plaintiff's true abilities exceeded those reflected in the FCE. Plaintiff fails to show reversible error on this issue.

**D.    DVR Evaluation**

Plaintiff sought assistance from the Wisconsin Division of Vocational Rehabilitation ("DVR"), and in May 2012 the DVR produced a vocational evaluation report. The report concluded:

> It is recommended that [plaintiff] participate in a part time Work Experience, once mental health stability is maintained and abstinence from alcohol is maintained. Following a successful Work Experience, it is recommended that [plaintiff] participate in a structured and guided part time job search assisted by a community based placement facility. [Plaintiff] will also benefit from the short-term services of a job coach, to ensure she understands job duties and employer's expectations. Accommodations and job site modifications will be required to accommodate [plaintiff's] physical limitations. She will not be able to lift more than 10 pounds and must alternate between sitting and standing approximately every half hour. A job will have to be carved out for her.

(Tr. at 457.)

The ALJ failed to consider this report. The Commissioner notes that the report is not a "medical opinion" which must be considered under social security regulations; she further notes that disability determinations made by other agencies are not binding on the Social Security Administration. Plaintiff does not argue that this report is a medical opinion or disability determination; rather, she contends that it is an opinion from a non-medical source, which the ALJ should have considered under 20 C.F.R. § 404.1527(f)(2). I agree. The ALJ

11

should on remand consider the DVR report.  See Brinley v. Berryhill, 732 Fed. Appx. 461, 466 (7th Cir. 2018); Neave v. Astrue, 507 F. Supp. 2d 948, 967 n.18 (E.D. Wis. 2007).

### III.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and this matter is remanded for further proceedings consistent with this decision.  The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 23rd day of January, 2019.

/s Lynn Adelman
LYNN ADELMAN
District Judge